# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 03 C 8404 | **DATE** | 8/19/2004 |
| **CASE TITLE** | Cintas Corporation vs. Daniel A. Perry | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation to Hon. Elaine E. Bucklo submitted herewith. This court respectfully recommends that Cintas' Motion for Preliminary Injunction [5-1] be DENIED. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995). *Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | AUG 20 2004 | |
| | Notified counsel by telephone. | date docketed | 38 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| ✓ | Copy to judge/magistrate judge. | 8/19/2004 date mailed notice | |
| GR | courtroom deputy's initials | GR | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

AUG 2 0 2004

| | | |
|---|---|---|
| CINTAS CORPORATION, | ) | |
| a Washington corporation, | ) | |
| Plaintiff, | ) | Cause No. 03 C 8404 |
| | ) | |
| v. | ) | Judge Elaine Bucklo |
| | ) | Magistrate Judge Geraldine Soat Brown |
| DANIEL A. PERRY, | ) | |
| Defendant. | ) | |

To:   The Honorable Elaine Bucklo
      United States District Court Judge

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge

Plaintiff Cintas Corporation ("Cintas") filed a Motion for Preliminary Injunction, seeking, *inter alia*, to enjoin Defendant Daniel Perry ("Perry"), a former employee, from competing with Cintas for a period of two years. (Pl.'s Mot. at 15.) [Dkt 5.] The District Judge referred Cintas' motion to this court to conduct necessary proceedings and submit a report and recommendation. [Dkt 9.] For the following reasons, this court respectfully recommends that Cintas' Motion for Preliminary Injunction be DENIED.

## PROCEDURAL BACKGROUND

On November 6, 2003, Cintas filed a complaint against Perry in the Circuit Court of Cook County, Illinois (Case No. 03 CH 18621) claiming that Perry breached an employment agreement by entering into employment with Aramark Uniform and Career Apparel, Inc. ("Aramark") within

1



twenty-four months of resigning from Cintas, and by soliciting former customers of Cintas for the benefit of Aramark. (Notice of Removal, Ex. A, Compl. ¶ 28.) [Dkt 1.] In its complaint, Cintas sought both injunctive relief and monetary damages. (*Id.* at 10-11.)

On November 21, 2003, Perry removed the action to federal court based on diversity of citizenship. (Notice of Removal ¶ 4.) On December 12, 2003, Cintas filed its Motion for Preliminary Injunction, claiming that Perry materially breached the Agreement when he joined Aramark and asking the court: (A) to enjoin Perry from competing with Cintas for a period of two years following the entry of the injunction;[1] (B) to enjoin Perry from soliciting, hiring or attempting to hire any Cintas client, employee or candidate whose identity or qualifications Perry learned while employed by Cintas; (C) to enjoin Perry from disclosing to any other person or entity, or misappropriating for his own use or benefit, any trade secrets or other confidential or proprietary information of Cintas; (D) to enjoin Perry from calling on or soliciting any Cintas customers or prospects for a period of two years following the entry of the injunction;[2] (E) to enjoin Perry from doing business with or performing any services or selling any goods that Perry obtained in breach of his duties of Cintas; (F) to direct an accounting to determine the proceeds derived by Perry as a result of his misappropriations of trade secrets and other Confidential Materials and Information of Cintas;[3] and

---

[1] During the course of the hearings, Cintas changed its position regarding the date on which the two year period should begin to run, presumably in light of Ohio law. (Tr. 167-68.) Cintas now claims that Perry should be enjoined for two years from the date on which he left Cintas (October 27, 2003), as opposed to the date on which an injunction is entered. (Pl.'s Post-Hr'g Br. at 3 n. 2.)

[2] *See* previous footnote.

[3] Based on its post-hearing brief, it appears that Cintas has dropped its request for an accounting. (Pl.'s Post-Hr'g Br. at 3.) In addition, Cintas' counsel stated at the hearing that Cintas is *not* alleging that Perry misappropriated its trade secrets. (Tr. 442.) *See also* Pl.'s Reply

(G) to grant any other relief as the court deems just and proper. (Pl.'s Mot. at 15-16.)[4]

On January 26, 2004, Perry filed his Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, claiming that Cintas' motion should be denied because Cintas cannot establish irreparable harm, an inadequate remedy at law or a likelihood of success on the merits. (Def.'s Opp'n Mem. at 6-14.) [Dkt 8.]

The District Judge referred Cintas' motion to this court to conduct a preliminary injunction hearing and to submit a report and recommendation. Both parties filed pre-hearing briefs [dkt 15, 16], and a three-day preliminary injunction hearing was held on April 27, June 21 and June 22. [Dkt 21, 26, 27.][5] In addition, the parties submitted deposition testimony of five witnesses.[6] Cintas submitted a post-hearing brief in support of its motion [dkt 34], Perry filed a response [dkt 36], and Cintas filed a reply brief [dkt 37]. Based on the evidence adduced at the hearing and the written submissions of the parties, this court respectfully recommends that Cintas' motion be denied.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Factual background

1. <u>Perry's employment at Cintas</u>

----

Br. at 3.

[4] Contemporaneously with its motion for preliminary injunction, Cintas filed a motion for limited expedited discovery. [Dkt 4.] That motion was granted by the District Judge on December 22, 2003. [Dkt 6.]

[5] The hearing scheduled for April 28, 2004 was rescheduled (by agreement of the parties) to June 21, 2004, in light of certain developments pertaining to Omar Harris, another Aramark employee. (April 28, 2004 Order.) [Dkt 22.] References to the transcript of the hearings are cited herein as "Tr. ___."

[6] The parties submitted designated portions of the deposition testimony of Richard Bryant, Harold McCadd, Ileana Salazar, Omar Harris and John Salveson. (Tr. 522-28.)

Cintas is a Washington corporation and has its headquarters and principal place of business in Ohio. (Compl. ¶ 1; Answer ¶ 1.) Cintas is engaged in the business of renting, selling, processing and delivering corporate identity uniforms and related products. (Answer ¶ 1.) According to Cintas, it operates in 46 states within the U.S., including Illinois, as well as Canada and Mexico. (Compl. ¶ 1.)

On or about January 14, 1993, Cintas hired Perry as a Sales Representative in its Bedford Park, Illinois facility. (Answer ¶¶ 3, 11.) Perry was subsequently promoted to Sales Manager and then to Director of Sales Training & Development for the North Central Group of Cintas. (Id.) During that time, Perry was based in Cintas' offices in metropolitan Chicago. (Id. ¶ 3.)

In or around October 2000, Perry was promoted to National Account Manager ("NAM"). (Id. ¶ 11.) As a condition of his continued employment with Cintas, Perry signed an employment agreement dated October 10, 2000 (the "Agreement"). (Compl., Ex. A, Agreement; Tr. 338-39.) Paragraph 1 of the Agreement provides in part:

> As a leader in the highly-competitive Industries [previously defined term], Employer has developed and implemented confidential strategies and programs, which include expansion and acquisition plans, market research, sales systems, marketing programs, product development strategies, budgets pricing strategies, identity and requirements of customers and prospects, methods of operating, service systems, computer passwords, other trade secrets and confidential information regarding customers, prospects and employees of Employer or of its customers and other information not known to the public (collectively "Confidential Materials and Information"), giving Employer an advantage over competitors not aware of such Confidential Materials and Information.

(Agreement ¶ 1.)

Paragraph 3 sets forth Perry's acknowledgments and covenants:

> (a)  Confidential Materials and Information.  In performing duties for Employer, Employee regularly will be exposed to and work with Employer's

4

Confidential Materials and Information. Employee acknowledges that such Confidential Materials and Information are critical to Employer's success and that Employer has invested substantial money in developing Employer's Confidential Materials and Information. While Employee is employed by Employer, and after such employment ends for any reason, Employee will not reproduce, publish, disclose, use, reveal, show, or otherwise communicate to any person or entity any Confidential Materials and Information of Employer unless specifically assigned or directed by Employer to do so. The covenant in this Subparagraph (a) has no temporal, geographical or territorial restriction or limitation, and it applies wherever Employee may be located.

(b) Non-Solicitation of Employees. While Employee is employed by Employer, and for twenty-four (24) months after such employment ends for any reason, Employee, acting either directly or indirectly, or through any other person, firm or corporation, will not induce or attempt to induce or influence any employee of Employer to terminate employment with Employer when Employer desires to retain that person's services. The covenant in this Subparagraph (b) has no geographical or territorial restriction or limitation, and it applies wherever Employee may be located.

(c) Covenant Against Unfair Competition. While Employee is employed by Employer, and for twenty-four (24) months after such employment ends for any reason, Employee will not, either directly or indirectly, (i) be employed in a managerial or professional position by, consult for, engage in any Industries business for, or have any ownership interest in any of Employer's competitors named in the attached Appendix A, which will be updated periodically by Employer issuing to Employee a revised and dated list including names of new significant competitors or successors to any previously-listed competitors, or (ii) call on, solicit or communicate with any of Employer's customers or prospects for the purpose of obtaining any Industries business other than for the benefit of Employer. . . .

(d) Return of Confidential Materials and Information. Employee agrees that whenever Employee's employment with Employer ends for any reason, all documents containing or referring to Employer's Confidential Materials and Information as may be in Employee's possession, or over which Employee may have control, will be delivered by Employee to Employer immediately, with no request being required.

(e) Irreparable harm. Employee agrees that a breach of any covenant in this Paragraph 3 will cause Employer irreparable injury and damage for which Employer has no adequate remedy, and Employee further agrees that if Employer claims a breach of any such covenant, Employer will be entitled to seek an immediate restraining order and injunction to prevent, pending or

following arbitration under Paragraph 5 below, such violation or continued violation, without Employer having to prove damages, and if Employee has violated any covenant in this Paragraph 3, Employee will pay all litigation costs and expenses and Employer's reasonable attorney fees necessarily incurred in the litigation, in addition to any other remedies to which Employer may be entitled at law or equity. If Employer sues Employee for an alleged breach of covenant(s) in this Paragraph 3 and the court rules that Employee has not violated such covenant(s), Employer will pay all litigation costs and expenses and Employee's reasonable attorney's fees necessarily incurred in the litigation.

(*Id.* ¶ 3).[7]

One of thirty-two competitors listed on Appendix A of the Agreement is "Aramark." (Agreement, App. A; Answer ¶ 7.) According to Cintas, Aramark is its largest competitor in the business of renting, selling, processing and delivering corporate identity uniforms and related products throughout the U.S., including Illinois. (Compl. ¶ 7; Tr. 315-16, 340.)

Paragraph 4 of the Agreement provides that the Agreement shall be interpreted, governed and enforced according to the Federal Arbitration Act and the law of the State of Ohio. (Agreement ¶ 4.) Paragraph 6 permits a court to modify any portion of the Agreement if it is held to be invalid or unenforceable in any respect. (*Id.* ¶ 6.)

As a NAM, Perry was charged with building intimate relationships with large corporations and selling national accounts (Tr. 114, 320), which Cintas defines as accounts with an "initial spend" of at least $250,000, usually at multiple locations (Tr. 321). Perry was responsible for national

---

[7] Subparagraph 3(a) is referred to herein as the "Non-Disclosure Covenant;" subparagraph 3(b) is referred to as the "Non-Solicitation Covenant;" and subparagraph 3(c) is referred to as the "Covenant Not to Compete."

It appears from subparagraph 3(e) of the Agreement that Cintas can only seek an injunction against Perry "pending or following arbitration" under Paragraph 5 of the Agreement. However, Paragraph 5 only applies to Employees' claims against Cintas, not Cintas' claims against Employees. In any event, neither party is seeking to compel arbitration.

accounts headquartered in Illinois and Indiana. (Tr. 322.) In an effort to service those accounts, however, Perry would often travel to other states where those customers were operating, including California, Texas and New Jersey. (Tr. 323.) In the course of his job duties, Perry would contact the accounts in his region and prepare pricing proposals. (Tr. 110-13, 324.) During his employment with Cintas, Perry obtained Confidential Materials and Information, as that term is defined in the Agreement. (Tr. 110.) Perry had access to information regarding customers and prospects in his region, such as pricing information, cost of goods, contact information and historical data. (Tr. 110-11; Answer ¶ 15.) Perry also had access to Cintas' marketing plans, strategies and policies for servicing national accounts. (Answer ¶ 13.) As a NAM, Perry received special training, had access to certain restricted computer databases and attended national meetings and seminars where he received confidential strategy and marketing information. (*Id.* ¶¶ 14, 16; Tr. 360-63.) NAMs are at the highest levels of Cintas' security clearance. (Tr. 360.)

2.    Perry's move to Aramark

In 2003, Perry provided his resume and an unsigned copy of a Cintas' employment agreement to Salveson & Stetson Group, Inc. ("SSG"), an executive search firm. (Tr. 33, 559-60; Pl.'s Ex. 151, Perry's Resume and Blank Cintas Employment Agreement.) In May 2003, Perry had a telephone conversation with Doug Battista, the Director of Human Resources for Aramark's Western Region, regarding employment opportunities at Aramark. (Tr. 22-24.) During that conversation, Perry told Mr. Battista about the Covenant Not to Compete. (Tr. 25.) In the summer and fall of 2003, Perry visited Aramark's corporate offices in California on three occasions. (Tr. 26-27, 30-33, 38, 49.)

On October 14, 2003, Perry signed an offer letter from Aramark for the position of Vice

President of Field Sales for the Western Division. (Tr. 24, 42-43; Def.'s Ex. 7, Aramark Offer Letter.) The offer letter stated that, as a condition of Aramark's offer of employment, Perry could not violate any non-disclosure, confidentiality or non-solicitation provisions of any employment agreement to which he was a party while employed at Cintas. (Def.'s Ex. 7, Aramark Offer Letter at 3-4.) Upon beginning employment with Aramark, Perry also was required to confirm that he did not bring any property or information belonging to any former employer, that he would not use and would protect from disclosure any confidential or proprietary information of any former employer and that he would comply with any covenants not to solicit employees of any former employers. (Def.'s Ex. 9, Aramark's Proprietary Information Obligations Checklist; Def.'s Ex. 25, New Employee Guidelines document.)

On October 20, 2003, Perry advised Martin Rogman, the Director of National Accounts, that he was voluntarily resigning from Cintas. (Answer ¶ 20; Tr. 42, 312.) Perry's last day of employment with Cintas was October 27, 2003. (Answer ¶ 20; Tr. 41.) On October 28, 2003, Perry started working for Aramark in California. (Tr. 16, 41.)[8]

3.   Perry's employment at Aramark

Perry testified that, as an employee of Aramark's regional field sales division, Perry does not have any contact with any accounts valued over $250,000. (Tr. 552-53.) As Vice President of Field Sales for the Western Division, the geographic range of Perry's responsibilities is centered in California, but also includes Washington, Oregon, Arizona, Utah, Colorado, Texas, Oklahoma, and

---

[8] According to Cintas, it did not learn that Perry had accepted employment with Aramark until November 3, 2003. (Compl. ¶ 22.)

portions of Arkansas, Louisiana and Mississippi. (Tr. 24, 63-64.) Aramark's Western Region does not include Illinois, Indiana or Wisconsin. (Tr. 63-64.) In his position, Perry is primarily responsible for training and developing field sales personnel in the Western Region. (Tr. 58.) According to Perry, his job responsibilities do not include contacting customers (Tr. 552), calling on prospective customers (*id.*), or soliciting prospective employees (Tr. 554). As Vice President of Field Sales, Perry's customer contact is limited to "incidental contact" with customers while evaluating his regional field sales personnel. (Tr. 24, 552.) Perry testified that, in his first eight months at Aramark, he had incidental contact with about nine or ten customers in order to evaluate a salesperson's job performance. (Tr. 557-58.) Perry played no role in identifying those customers. (*Id.*)

## Standard for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Boucher v. School Bd. of the Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998) (quotations omitted). Accordingly, to prevail on a motion for preliminary injunction, Cintas must demonstrate that (1) its case has a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Foodcomm Intl. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (citing *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002)). If those three conditions are met, the court must balance the harm to Cintas if the injunction is not issued against the harm to Perry if it is issued. *Id.* (citing *Storck v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)). That balancing involves a sliding scale analysis: the greater Cintas' chances of success on the merits, the less strong a showing it must make that the balance of the harm is in

its favor. *Id.* In addition, the court must take into account the public interest at risk if injunctive relief is granted or denied. *Promatek Indus.*, 300 F.3d at 811; *see also Baskin-Robbins Inc. v. Patel*, 264 F. Supp. 2d 607, 609 (N.D. Ill. 2003).

1.    Likelihood of Success on the Merits

The likelihood of success on the merits often serves as a threshold requirement for entitlement to preliminary relief. *Outsource Intl., Inc., v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999). The Seventh Circuit has stated that the threshold for that showing is low and that the plaintiff need only demonstrate a "better than negligible chance of succeeding." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (quoting *Boucher*, 134 F.3d at 824)). Perry argues that the "better than negligible" standard has not, in fact, been applied, and quotes a decision from the Southern District of Indiana stating that "[w]here the balance of harms does not heavily favor the moving party, . . . the moving party must show at least a 'reasonable likelihood' of success on the merits." *Eco Mfg. LLC v. Honeywell Intl., Inc.*, 295 F. Supp. 2d 854, 865 n. 4 (S.D. Ind. 2003) (citing *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)). It is not necessary to resolve that issue because, even considering the evidence under the "better than negligible" standard, Cintas has not demonstrated that it is likely to succeed on the merits of its breach of contract claims.

Cintas claims that Perry breached the Agreement in four ways: (1) by soliciting Cintas' customers for the benefit of Aramark; (2) by recruiting Cintas' employees; (3) by disclosing Cintas' Confidential Materials Information; and (4) by working for Aramark within twenty-four months of

leaving Cintas.[9] (Compl. ¶ 28; Pl.'s Post-Hr'g Br. at 11.)  Based on the choice-of-law provision in the Agreement, Cintas' claims are governed by Ohio law.[10]  In order to prove a breach of contract claim under Ohio law, a plaintiff must show the existence of a valid contract, performance by the plaintiff, breach by the defendant and damage or loss to the plaintiff. *Allied Erecting & Dismantling Co., Inc. v. Uneco Realty Co.*, 765 N.E.2d 420, 424, 425 (Ohio Ct. App. 2001).

 

    A.    Cintas has not proven that Perry solicited
           Cintas' customers for the benefit of Aramark.

Pursuant to Subparagraph 3(c)(ii) of the Covenant Not to Compete, Perry cannot directly or indirectly "call on, solicit or communicate with any of [Cintas'] customers or prospects for the purpose of obtaining any Industries business other than for the benefit of [Cintas]" while employed at Cintas and for two years after leaving Cintas. (Agreement ¶ 3(c)(ii).) Cintas' allegation that Perry violated that provision of the Agreement was made "upon information and belief." (Compl. ¶ 28.) At the hearing, Cintas failed to offer any evidence to sustain that allegation. Although Cintas made several attempts, it was unable to show that Perry solicited a Cintas customer or prospect or that

_____

[9] In its complaint, Cintas only alleged that Perry violated the Agreement by working for Aramark and soliciting Cintas' customers. (Compl. ¶ 28.) Cintas did not assert its additional theories (that Perry improperly recruited Cintas' employees and disclosed Cintas' confidential information) until after the hearing.

[10] A district court sitting in diversity must apply the substantive law suggested by the conflict rules of the forum state. *Medline Indus., Inc. v. Grubb*, 670 F. Supp. 831, 834 (N.D. Ill. 1987) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). Because Illinois courts enforce contractual choice of law provisions and the Agreement provides that Ohio law controls its interpretation and enforcement, Ohio law governs Cintas' claim that Perry breached the Agreement. *Id.* (citing *Sarnoff v. American Home Prods. Corp.*, 798 F.2d 1075, 1080 (7th Cir. 1986)). The parties agree that Ohio law governs Cintas' claims, at least for purposes of deciding the present motion. (Pl.'s Mot. at 8; Def.'s Pre-Hr'g Br. at 1.)

Cintas lost a customer or prospect based on Perry's actions.

Cintas presented evidence that by July 2003, Perry had discussed his possible move to Aramark with J.R. Ohmen of Archer Daniels Midland ("ADM"), one of his former Cintas accounts. (Pl.'s Ex. 90, July 21, 2003 E-mail from J.R. Ohmen to Perry; Tr. 121, 461-62, 499-500, 546-48.) Perry testified that Mr. Ohmen was married to a college friend of Perry, and that by the summer of 2003, Mr. Ohmen was a financial analyst at ADM and no longer associated with the business relationship between ADM and Cintas. (Tr. 547.) More importantly, in August 2003, through Perry's negotiation, ADM "transitioned" from a "voluntary" contract to a "mandatory" contract with Cintas until at least 2006, and possibly longer. (Tr. 121-122, 499-500; 548-49.) A "mandatory" contract is more favorable to Cintas because it means that ADM is contractually obligated to purchase its uniform and supply needs from Cintas until at least 2006. (Tr. 121-122, 499-500.) Perry signed that mandatory contract on behalf of Cintas in August 2003. (Tr. 501.) ADM remains a Cintas customer today. (Tr. 499-500.) That fact rebuts any suggestion that Perry attempted to lure ADM to Aramark.[11]

Cintas also presented evidence that Perry accompanied Richard Bryant, an Account Manager with Aramark, on a sales call to a company that had a contract with Cintas. (Bryant Dep. at 5, 10-11, 14, 42.) However, Mr. Bryant testified that, although Perry went on a "ride-along" with him in December 2003, Perry had no prior knowledge of the customers that Mr. Bryant was scheduled to

---

[11] Cintas apparently suggested that Perry, on behalf of Aramark, had also contacted Nancy Carlson of ADM. (Def.'s Opp'n Mem., Ex. 2, Jan. 21, 2004 E-mail from Martin Rogman to Gregory L. Sugar). However, Ms. Carlson subsequently signed a declaration stating that she has had no contact with Perry since he became affiliated with Aramark. (Def.'s Opp'n Mem., Ex. 3, Declaration of Nancy Carlson.) Cintas did not present any evidence at the hearing that Perry contacted Ms. Carlson to solicit ADM for Aramark.

visit that day and that, as soon as Perry learned that the customer ("Tru-Circle") was a Cintas account, Perry informed Mr. Bryant of his covenant not to compete with Cintas. (*Id.* at 10-12, 42-44.) Mr. Bryant further testified that Perry stayed in the car while Mr. Bryant met with the Tru-Circle representatives. (*Id.* at 11-12, 44.) Mr. Bryant had worked on getting the Tru-Circle business for three years and had personally visited Tru-Circle three times prior to the day with Perry. (*Id.* at 41.) When asked if Perry instructed him on how to sell to Tru-Circle, Mr. Bryant responded: "Absolutely not." (*Id.* at 107.) Although Perry assisted Mr. Bryant in installing the Aramark mats in the facility later that day, Mr. Bryant had prepared the contract and believed that the deal was "in place." (*Id.* at 14, 44, 46-51, 56, 107.)

Perry admitted that in the summer of 2003, he told representatives of two Cintas customers, Tom Wright of Supply Force and Carol Gauer of Abbott Laboratories, about his possible employment with Aramark. (Tr. 124-25.) Perry testified that since joining Aramark, he has had no contact with anyone from Supply Force or Abbott Laboratories (Tr. 122-23), and Cintas presented no evidence to the contrary. There is no evidence that Perry "solicited" those customers for Aramark or that Cintas has lost either of those accounts as a result of Perry's actions.

Based on the current record, there is simply no evidence to support Cintas' claim that Perry violated the Agreement by soliciting Cintas' customers or prospective customers.

### B. Cintas has not proven that Perry solicited Cintas employees to join Aramark.

Cintas was equally unsuccessful in showing that Perry violated the Non-Solicitation Covenant, which prohibits Perry from inducing or attempting to induce or influence Cintas employees to terminate their employment with Cintas. (Agreement ¶3(b).) Although Cintas

presented evidence that Perry interviewed Tanya Knox in December 2003 (McCadd Dep. at 21, 27-28), the evidence established that, at the time of the interview, Ms. Knox was not working for Cintas; she had terminated her employment a month earlier. (*Id.* at 59.) Even Cintas concedes that, at the time of the interview, Ms. Knox was a "former" Cintas employee. (Pl.'s Post-Hr'g Br. at 11.) As written, subparagraph 3(b) does not prohibit Perry from soliciting former employees of Cintas. (Agreement ¶3(b).) Furthermore, although Ms. Knox was given a verbal offer to come work for Aramark, that offer was later revoked apparently because of her own non-competition agreement with Cintas. (McCadd Dep. at 21-22, 60.)

Cintas also claimed that Perry contacted Harold McCadd, while Mr. McCadd was working as a Sales Manager for Cintas, and "encouraged McCadd to accept employment with Aramark." (Pl.'s Post-Hr'g Br. at 11.) That allegation is not supported by the evidence. According to Mr. McCadd, in a September 2003 telephone conversation, Perry asked Mr. McCadd if he was "considering an opportunity with Aramark." (McCadd Dep. at 13-15.) Mr. McCadd testified: "I think I responded yes, I am, and if I've heard correctly you have accepted a position with Aramark, congratulations. And that's really the exchange." (*Id.* at 14-15) There is no indication from Mr. McCadd's testimony that Perry "encouraged" him to accept a position with Aramark during that conversation or on any other occasion, let alone that Perry "induced" Mr. McCadd to join Aramark.

Cintas also argued that Perry violated the Agreement in October or November 2003 when he spoke to Mr. McCadd at a management operation meeting regarding employment opportunities at Aramark. (Pl.'s Post-Hr'g Br. at 11.) At the time of that conversation, however, Mr. McCadd had already resigned from Cintas and accepted an offer to join Aramark. (McCadd Dep. at 11-12.) There is nothing in the Agreement that prohibits Perry from discussing employment opportunities with

Aramark employees who are former Cintas employees.

In light of the foregoing, Cintas' claim that Perry breached the Agreement by soliciting Cintas' employees is unsupported by the record.

### C.    Cintas has not proven that Perry used Cintas' confidential information.

The Non-Disclosure Covenant prohibits Perry from using or disclosing Cintas' Confidential Materials and Information, as that term is defined in Paragraph 1 of the Agreement, unless specifically directed to do so by Cintas. (Agreement ¶ 3(a).) That provision has no temporal or geographical limitations. (*Id.*) In its post-hearing brief, Cintas asserts that Perry has "already actually used on several occasions during his employment with Aramark certain confidential information that he took from Cintas" (Pl.'s Post-Hr'g Br. at 10), referring to a "productivity tenure report" (Pl.'s Ex. 183, Productivity Tenure Report) and the two computer disks that Perry gave to his executive assistant at Aramark, Ileana Salazar.

The productivity tenure report is an Excel spreadsheet, reflecting account managers and their backgrounds (*e.g.*, if they were from outside or within the industry or "fresh off the street," and internal promotions). (Salazar Dep. at 27-28, 31-32.) According to Perry, he found the Cintas productivity tenure report in the drawer of a desk in Aramark's Seattle office in November or December 2003. (Tr. 217-18.) He gave it to Ms. Salazar because he thought it might be useful to explain the format of a report that he was trying to get her to prepare. (Tr. 218.) However, Ms. Salazar testified that when Perry gave her the report, it was in an old, white, three-ring binder, which she saw about a week after Perry started at Aramark. (Salazar Dep. at 28-29, 52, 69.)[12] When Ms.

---

[12] Perry began at Aramark on October 28, 2003. (Tr.16.)

Salazar asked Perry whether any of the information contained in the binder was copyrighted, Perry advised her that everything in the binder, including the report, was his own work. (*Id.* at 52, 67.)

In light of Ms. Salazar's testimony, the court is skeptical that Perry simply found the report in Aramark's Seattle office. However, it is undisputed that when Perry gave the report to Ms. Salazar, he asked her to use the template of the report, not the contents. (*Id.* at 28-29, 31.) She used it as "a visual of exactly what he was asking for." (*Id.* at 31.) Ms. Salazar has not given a copy of the report to anyone else at Aramark. (*Id.* at 83.)

With respect to the two computer disks (which contained documents that Perry prepared while at Cintas), Perry testified that he found the disks in his house in Chicago when he was preparing to move to California. Specifically, Perry testified that he was going through a storage closet in his basement and found the disks in the bottom of a box. (Tr. 226; Pl.'s Exs. 181A, 182, Disks and hard copy print-outs of disks' contents.) When he found the disks, Perry saw the word "tenure" on them and "thought that [they] might help [Ms. Salazar] create the spreadsheet that [she was] having so much trouble trying to format." (Tr. 226; Pl.'s Ex. 181A, Disk and hard copy print-out of disk's contents.) Ms. Salazar confirmed that Perry gave her the disks to assist her in preparing the productivity tenure report. (Salazar Dep. at 56.) Ms. Salazar further testified that she only opened one of the disks, which was labeled "Productivity," and that on that disk she found a file named "Tenure. XLS," which was an exact duplicate of the hard copy of the productivity tenure report. (*Id.* at 57-58, 78.) That was the only document on the "Productivity" disk that Ms. Salazar opened. (*Id.* at 60.) Ms. Salazar explained that, from the report on the disk, she was able to copy the formulas, which are mathematical equations embedded within the Excel program that were not available from the hard copy of the report. (*Id.* at 58, 80-81.) Ms. Salazar did not use any of the cell

16

contents (the actual data); she used only the formulas. (*Id.* at 81, 83.) According to Perry, he never looked at the contents of those disks after he found them in his home. (Tr. 231.)

It appears that the information contained on the computer disks was several years old. (Pl.'s Exs. 181A, 182, Disks and hard copy print-outs of disks' contents.) Even though the hard copy print-outs of the disk contents were not admitted into evidence (based on Perry's counsel's objection), they were offered into evidence by Cintas, presumably because Cintas believed the print-outs were favorable to its position. (Tr. 232-33.) Based on the content of those print-outs, it appears that the information contained on the disks dates anywhere from 1995 through 1999 (Pl.'s Exs. 181A, 182, Disks and hard copy print-outs of disks' contents), which is consistent with Perry's testimony that the disks had been in the box for "quite a long time." (Tr. 227). Parenthetically, Ms. Salazar testified that she has never been able to create the productivity tenure report, which has been frustrating for her. (Salazar Dep. at 28, 56.)

Cintas conceded that neither the format nor the concept of a productivity tenure report is proprietary information. (Tr. 514.) Cintas has never argued that the formulas embedded within the Excel spreadsheet constitute Confidential Materials or Information. Although, pursuant to subparagraph (3)(d) of the Agreement, Perry should have returned the report and computer disks to Cintas after he realized that he had them, this court is not convinced that Perry's actions violated the Non-Disclosure Covenant. Cintas' confidential information (the content of the report, rather than its format) was not used, and there is no suggestion that Ms. Salazar had any interest in or use for the confidential information, as opposed to the format. Additionally, Cintas has failed to explain how the facts described above caused damage or loss to its business, which is another requisite

element of a breach of contract claim. *Allied Erecting & Dismantling*, 765 N.E.2d at 424.[13] Presumably, Cintas' business information from ten or even five years ago that might be contained on the disks is outdated and would be of limited usefulness to a competitor. In fact, other than generally stating that the report and disks contained "confidential and proprietary information," Cintas has not explained how any of the information contained therein would give Aramark an unfair competitive advantage. The court is not persuaded that Cintas could prove it suffered any damages as a result of Perry's actions.

An additional Cintas document, a NAM Performance Ranking Report (Def.'s Ex. 11, DAP 35) was produced by Perry in discovery. (Tr. 391- 92.) It shows the ranked performance of Cintas' NAMs through July 2003. (*Id.*) It is confidential and in effect reveals the emphasis Cintas puts on certain areas. (Tr. 392.) Perry testified that he has not given that document to anyone at Aramark, and has not used it in any way in his job at Aramark, because he does not deal with national accounts. (Tr. 545.) Perry testified that he kept the document (which shows that Perry was the top ranked NAM) for "bragging." (Tr. 546; Def.'s Ex. 11, DAP 35, NAM Performance Ranking Report.) Cintas did not provide any evidence that Perry has, in fact, used or disclosed that confidential document since leaving Cintas. Ms. Salazar testified that she had never seen that document. (Salazar Dep. at 76.)

Finally, in a last ditch effort to show that Perry violated the Non-Disclosure Covenant, Cintas claims that, in August 2003, Perry downloaded a blank employment agreement from Cintas' restricted-access and confidential intranet database and sent it to SSG, the executive search firm with

---

[13] To the extent Cintas relies on its inevitable disclosure argument to demonstrate that an injury should be presumed, the merits of that argument are discussed below.

which he was working. (Pl.'s Post-Hr'g Br. at 11; Pl.'s Ex. 151, Perry's Resume and Blank Cintas Employment Agreement.) Cintas conceded that Perry would have the right to disseminate a *signed* version of his employment agreement. (Tr. 579.) Rather, Cintas takes issue with Perry sending SSG a blank copy of a Cintas' employment agreement, which he obtained from Cintas' computer system. However, Cintas fails to explain why an unsigned employment agreement is confidential, while its executed counterpart is not. One would expect an employee, before negotiating new employment agreement, to provide the executive search firm with information about any restrictions on his future employment. Other than the "confidential" stamp that was placed on the blank employment agreement for purposes of this litigation, there is no indication on the document itself that it was deemed confidential by Cintas. (Pl.'s Ex. 151, Blank Cintas Employment Agreement.) Although Cintas concludes that the blank employment agreement constitutes "Confidential Material and Information" (Pl.'s Post-Hr'g Br. at 11), it fails to explain how the information contained in that document gives Cintas an "advantage over competitors" (*see* Agreement ¶ 1) when that same information is found in an executed employment agreement that admittedly can be made public.[14] This court finds no merit in Cintas' argument that Perry breached the Non-Disclosure Covenant when he sent SSG a blank copy of a Cintas' employment agreement.

---

[14] Although Cintas' counsel indicated at the hearing that there were "several material differences" between the employment agreement signed by Perry and the blank employment agreement he downloaded and sent to SSG (Tr. 571), Cintas never explained the nature of those discrepancies or argued that the discrepancies were what made the unsigned agreement confidential.

D.   The portion of the Agreement that prohibits Perry from working
     for Aramark within two years of leaving Cintas is unenforceable.

As its final allegation, Cintas claims that Perry breached the Agreement when he began

working for Aramark within two years of leaving Cintas. It is undisputed that Perry began working

for Aramark, one of the competitors listed on Appendix A, immediately after he terminated his

employment with Cintas. By working for Aramark, Perry breached the Covenant Not to Compete.

However, in order to succeed on a breach of contract claim, Cintas must also show that the Covenant

Not to Compete is valid and enforceable under Ohio law. *See Biomedical Innovations, Inc. v.

McLaughlin*, 658 N.E.2d 1084, 1087-88 (Ohio Ct. App. 1995) ("As the alleged breach related to the

noncompetition portion of the agreement, appellant is required to show that the noncompetition

agreement was valid.").

Ohio courts generally look upon non-competition agreements with some skepticism and have

cautiously considered and carefully scrutinized them. *Lake Land Empl. Group of Akron, LLC v.

Columber*, 804 N.E.2d 27, 30 (Ohio 2004) (citing Covenants Not to Compete, 36 Akron L. Rev. 49,

50 (2002)). A covenant not to compete is an agreement in the restraint of trade, is therefore

disfavored in the law, and must be construed strictly. *Single Source Packaging, LLC v. Cain*, No.

2003-CA-14, 2003 WL 22064129 at *6 (Ohio Ct. App. Sept. 5, 2003) (Fain, J.) (citations omitted);

*see also Robert W. Clark, M.D., Inc. v. Mount Carmel Health*, 706 N.E.2d 336, 340 (Ohio Ct. App.

1997). Modern economic realities, however, do not justify a strict prohibition on non-competition

agreements between employer and employee in an at-will relationship. *Lake Land*, 804 N.E.2d at

30. Accordingly, the Ohio Supreme Court "has long recognized the validity of agreements that

restrict competition by an ex-employee if they contain reasonable geographical and temporal

restrictions."[15] *Id.* (citing *Briggs v. Butler*, 45 N.E.2d 757 (Ohio 1942)); *see also Robert W. Clark*, 706 N.E.2d at 340 (stating that "restrictive covenants are not *per se* unenforceable and if reasonable may be enforced by injunctive relief").

In *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975), the Ohio Supreme Court established the test of reasonableness for non-competition agreements. Specifically, the court stated:

> A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public.

*Id.* at 547. An employer seeking to enforce a restrictive covenant must establish, by clear and convincing evidence, each of those three elements. *Neff Motivation, Inc. v. Lagrou*, No. 01-CA-1560, 2002 WL 1251832 at *6 (Ohio Ct. App. June 7, 2002) (Grady, J.) (citation omitted). The *Raimonde* court articulated a number of other relevant factors that comprise "reasonableness" in the context of covenants not to compete:

> [t]he absence or presence of limitations as to time and space[;] . . . whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the

---

[15] Although not addressed by the parties, the Covenant Not to Compete must also be supported by adequate consideration. The Ohio Supreme Court recently held that consideration exists to support a non-competition agreement when, in exchange for the assent of an at-will employee to a proffered non-competition agreement, the employer continues an at-will employment relationship that could legally be terminated without cause. *Lake Land*, 804 N.E.2d at 32. Here, under the terms of the Agreement, Perry was an at-will employee who had no express contractual expectation of, or legal entitlement to, continued employment. He continued working for Cintas for over three years after he signed the Agreement. Thus, under Ohio law, the Covenant Not to Compete was supported by adequate consideration.

employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

325 N.E.2d at 547 (quotation omitted). In determining whether the restrictions of a covenant are reasonable, each case is to be decided on its own facts and tested by the totality of the circumstances. *Id.* (citation omitted). In this case, it is unlikely that Cintas will be able to prove, by clear and convincing evidence, that the Covenant Not to Compete is reasonable under the *Raimonde* test.

i. *No Greater than Necessary for the Protection of the Employer's Legitimate Business Interests*

Under the first prong of the *Raimonde* test, courts look to whether the restrictive covenant is greater than necessary for the protection of the employer's legitimate business interests. Cintas claims that it has a legitimate business interest in and ascertainable right to protect its Confidential Materials and Information, confidential competitive data, information regarding its customers and potential customers as well as in its customer, consultant and employee relationships. (Compl. ¶¶ 19, 29.) Cintas further argues that a breach of the restrictions contained in the Agreement "poses a substantial risk to Cintas' relationships with its customers, particularly its national accounts, since said relationships were developed and cultivated over time and at great expense to Cintas." (*Id.* ¶ 19.) Based on those statements, Cintas seems primarily concerned with its Confidential Materials or Information, including its customer information, as well as its customer and employee relationships. However, in light of the evidence produced at the hearing, the Covenant Not to Compete is much greater than necessary to protect those business interests.

Subparagraph 3(c)(i) of the Covenant Not to Compete restricts Perry from "be[ing] employed

in a managerial or professional position by, consult[ing] for, engag[ing] in any Industries business for, or hav[ing] any ownership interest in any of Employer's competitors named in the attached Appendix A, *which will be updated periodically by Employer issuing to Employee a revised and dated list including names of new significant competitors or successors to any previously-listed competitors, . . . .*" (Agreement ¶ 3(c)) (emphasis added). In other words, Cintas claims a unilateral right to revise Appendix A, after Perry signed the Agreement, to include any companies that it deems a competitor – a right it apparently exercises frequently. Mr. Rogman testified at the hearing: "[Cintas] takes great pains to try and incorporate all the competitors. Sometimes the names change or a new player enters the market . . . and I believe that they're all listed to the best of our company's ability . . . ." (Tr. 340.) Based on that fact, it appears that the Covenant Not to Compete seeks to eliminate *all* competition, not merely competition that is unfair to Cintas. *See Raimonde*, 325 N.E.2d at 547.

In addition, the phrase "managerial or professional position" is undefined and potentially subject to broad interpretation. (Agreement ¶ 3.) That phrase is, in fact, read by Cintas as including positions outside of the sales context, the only area in which Perry worked while at Cintas. Mr. Rogman testified that the Agreement would prohibit Perry from being employed even in Aramark's human relations department. (Tr. 497-98.)

Furthermore, Appendix A is not specifically limited to the "identity uniform" aspects of the companies listed. For example, Aramark also has a food services division and a facilities management division. (Tr. 58-59.) As written, the Agreement arguably would preclude Perry from

being employed by or consulting for any of those divisions.[16]

Although Ohio courts do not consider any particular geographic restriction to be *per se* unreasonable, they will not uphold restrictions that expand beyond what is necessary to protect an employer's legitimate business interests. *See, e.g., Professional Investigations & Consulting Agency, Inc. v. Kingsland*, 591 N.E.2d 1265, 1269 (Ohio Ct. App. 1990) (finding a non-competition clause with no geographic restrictions unduly restrictive); *National Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 891 (N.D. Ohio 1996) (finding that "the non-competition provision is greater than is required for the protection of [the plaintiff] . . . because it purports to restrict employment with a company in which [the defendant] would work outside of his original exclusive six-state territory"); *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 957 (D. Minn. 1999) (applying Ohio law) (stating that, "given the inherently territorial nature of [the former employee's] customer contacts, the almost worldwide application of the noncompete agreement makes its geographic scope unreasonably broad"). In this case, the geographical restriction, which basically prohibits Perry from working in any managerial or professional position, in any department, of any location, of any company that Cintas deems a competitor, is unreasonably broad in light of Cintas' asserted business interests. In his position at Aramark, Perry has little or no contact with current or prospective customers. (Tr. 552-53.) Furthermore, Perry's territory at Aramark does not include Illinois, Indiana or Wisconsin. (Tr. 63-64.) Thus, Cintas has not demonstrated that its customer information and customers relationships would be impacted by Perry's employment at Aramark.

---

[16] As drafted, the prohibition in Subparagraph 3(c) on employment by or consulting for the companies in Appendix A is not limited to activities relating to Cintas' "Industries," as defined in Paragraph 1 of the Agreement. *In addition to* those prohibitions, the employee is also prohibited from engaging in "Industries business for" any of the companies listed on Appendix A. (Agreement ¶ 3(c).)

Cintas relies on *Neff Motivation* in support of its position that the Covenant Not to Compete is reasonable. (Pl.'s Mot. at 10-11.) However, the decision in *Neff Motivation* actually supports a finding that the covenant in this case is unreasonably broad. In *Neff Motivation*, the defendant, a former sales representative, organized his own company in his former sales territory for purposes of selling merchandise similar to that of the plaintiff, NMI. 2002 WL 1251832 at *1. The trial court entered a permanent injunction prohibiting the defendant, for a period of close to two years, from selling NMI's most recent products to customers to which the defendant had sold NMI products since January 1, 2001 and to other customers in the same counties. *Id.* at *2. In affirming the trial court's decision, the Ohio Court of Appeals focused on the narrow scope of the injunction and particularly noted that it did not prohibit the defendant "from competing with NMI outright." *Id.* at *6. Clearly, the Ohio Court of Appeals was skeptical of such broad restrictions on employees. Here, the scope of the Covenant Not to Compete, which effectively prohibits Perry from working in any managerial or professional capacity for any identity uniform business in *any* sales territory, regardless of whether Perry sold any Cintas' accounts in that territory or not, is not narrowly tailored.

In its post-hearing briefs, Cintas argued *for the first time* that, if the Covenant Not to Compete is found to be unreasonably broad, the court "should modify the covenant as it sees fit, and enforce it as modified to protect Cintas' interests." (Pl.'s Post-Hr'g Br. at 8.) *See also* Pl.'s Reply Br. at 9. Cintas is correct that, under Ohio law, courts "are empowered to" modify or amend unreasonable employment agreements to the extent necessary to protect an employer's legitimate interests. *See Raimonde*, 325 N.E.2d at 547. However, Cintas did not suggest a draft modification, let alone present *any* evidence as to how the Covenant Not to Compete should be modified in this case, and whether, if so modified, it would result in an injunction against Perry's current

employment. Based on the current record and the fact that this case is at the preliminary-injunction stage, this court finds that modifying the Covenant Not to Compete at this juncture would be inappropriate, if not impossible.

### ii.    *Undue Hardship*

Under the second element of the *Raimonde* test, a covenant not to compete must not impose undue hardship on the employee. A determination that a covenant is unduly harsh requires a much greater standard than determining whether the covenant is merely unfair. *Robert W. Clark*, 706 N.E.2d at 342. "The *Raimonde* test requires more than just *some* hardship." *Id.* (quoting *Williams v. Hobbs*, 460 N.E.2d 287, 293 (Ohio Ct. App. 1983) (emphasis added)). Further, "[u]ndue hardship cannot be determined on a post hoc basis, but rather by the terms of the agreement at the time it was entered into." *Id.* (quotation omitted).

According to Perry, the granting of a preliminary injunction "would throw [him] into unemployment, and out of the industry in which he has worked for the vast majority of his professional career, cutting off his family's primary means of support." (Def.'s Opp'n Mem. at 2.) Ohio courts have considered the employee's ability to earn a livelihood in determining whether there would be undue hardship. In *Rogers v. Runfola & Assocs., Inc.*, 565 N.E.2d 540, 544 (Ohio 1991), for example, the Ohio Supreme Court found that a covenant which prohibited the defendants from engaging in court reporting or public stenography in Franklin County for a period of two years, and from soliciting or diverting any of the plaintiff's clients for a lifetime, was unreasonable and created an undue hardship on the defendants. In so deciding, the court noted that court reporting was a "unique profession" and that the defendants' testimony indicated that "court reporting [was] the only

profession in which they have become proficient." *Id.* The court in *Rogers* ultimately decided to modify the covenant so that the employees were only prohibited from working as stenographers or court reporters and from soliciting the employer's clients in the city of Columbus for one year. *Id.*

In contrast, the court in *Brentlinger Enters. v. Curran*, 752 N.E.2d 994, 1004 (Ohio Ct. App. 2001) (affirming denial of injunctive relief on other grounds) found that the restrictive covenant, which prevented the defendant from working in his area of speciality, the sale of European automobiles, and in the area in which he lived, would not be unduly prohibitive. Specifically, the court noted that the defendant's experience in selling automobiles "would be transferable to the sale of other types of cars" and the defendant could "continue working in the automobile sales field, even in types of foreign automobiles sales." *Id.* The court also found significant that the defendant was "restricted only from working in a very small geographical area eliminating only a small percentage of his possible employers." *Id. See also Parma Intl. Inc. v. Herman*, No. 54243, 1989 WL 12928 at *1, 4 (Ohio Ct. App. Feb. 16, 1989) (Dyke, J.) (upholding a covenant not to compete that prohibited an employee from engaging in any business similar to that conducted by the employer in geographical areas in which the employer conducted business during the last two years).

This case falls somewhere between *Rogers* and *Brentlinger*. If the covenant is enforced, Perry is essentially prohibited, for a period of two years, from being employed in any managerial or professional capacity by, or consulting for, any company that is also in the identity uniform business. Unlike court reporting, however, sales is not a "unique profession." There are a variety of other industries in which Perry could use his managerial or sales skills and not violate the covenant. On the other hand, Perry has been employed in the identity uniform business for eleven of the fourteen years of his professional career. According to Perry, even assuming that the Agreement could be

modified to allow employment in other Aramark divisions, Aramark cannot provide him comparable employment and salary should he be prohibited from working in the Uniform Services division. (Tr. 57-58.) Furthermore, unlike the covenants in *Brentlinger* and *Parma* or the modified covenant in *Rogers*, the Covenant Not to Compete is not limited to a particular county or to a very small geographical area, or even to geographical areas in which Cintas has conducted business in the last two years. Rather, the Covenant Not to Compete limits Perry from working for any division of any company that Cintas deems a competitor anywhere in the world. According to Mr. Rogman, Cintas attempts to include every "new player" in the identity uniform industry on Appendix A. (Tr. 340.) That does not eliminate a small percentage of possible employers in the uniform industry; rather, by Cintas' own assertions, it eliminates *all* possible employers in the identity uniform industry. Based on that expansive definition, this court finds that the covenant is unduly harsh.[17]

For all of the reasons set forth above, this court finds that Cintas' chances of succeeding on the merits of its breach of contract claims are not "better than negligible." Based on that finding, this court recommends that Cintas' Motion for Preliminary Injunction be denied.

2.    Irreparable Harm

The finding of irreparable harm to the plaintiff if the injunction is denied is also a threshold requirement for granting a preliminary injunction.[18] *Foodcomm Intl.*, 328 F.3d at 304. In an effort

---

[17] Because this court finds that the Covenant Not to Compete is unreasonably broad and imposes an undue burden on Perry, there is no need to address whether enforcement of the Covenant Not to Compete would harm the public.

[18] In support of its irreparable harm argument, Cintas cites a few Illinois and Ohio cases. (Pl.'s Mot. at 13 (citing *Central Water Works Supply, Inc. v. Fisher*, 608 N.E.2d 618, 623 (Ill. App. 4th Dist. 1993)); Pl.'s Pre-Hr'g Br. at 1 (citing *Kaeser v. Adamson*, Case No. 773, 1982 WL

to establish irreparable harm, Cintas first relies on Paragraph 3(e) of the Agreement, which states that "a breach of any covenant in this Paragraph 3 will cause Employer irreparable injury and damage for which Employer has no adequate remedy." (Pl.'s Mot. at 13.)[19] While having some persuasive value, that provision is not conclusive in the determination of ongoing irreparable harm. *See Baskin-Robbins Inc.*, 264 F. Supp. 2d at 611.

Next, Cintas asserts that irreparable injury should be "presumed" when "the protectible interest at stake is imperiled by a defendant's conduct." (Pl.'s Post-Hr'g Br. at 12) (citing *Pepsico, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965 at *29 (N.D. Ill. Jan. 2, 1996) (Lindberg, J.)). Specifically, Cintas claims that, "[g]iven the similarities in the nature and scope of Perry's sales positions with Cintas and his present position with Aramark, there is a great threat of harm to Cintas' business resulting from Perry's inevitable use or disclosure of Cintas' Confidential Materials and Information in his Aramark employment." (*Id.* at 9-10.) That argument is based on the so-called "inevitable disclosure" doctrine.[20]

---

5602 at *8 (Ohio Ct. App. Dec. 14, 1982) (Milligan, J.))). While Ohio law is relevant in determining a likelihood of success on the merits (*e.g.*, whether the covenant is enforceable), neither Ohio nor Illinois law applies when determining whether Cintas has established irreparable harm. "The propriety of the issuance of a preliminary injunction . . . is to be determined by the rules and decisions of federal courts." *General Elec. Co. v. American Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956); *see also Outsource*, 192 F.3d at 673-74 (Posner, J. dissenting) ("As a detail, I note that the court assumes that state rather than federal law governs the standard for the grant or denial of a preliminary injunction. Not so; it is federal law."); *Budget Rent A Car Corp. v. Harvey Kidd Automotive*, 249 F. Supp. 2d 1048, 1050 (N.D. Ill. 2003) (stating that "whether [the plaintiff] has established irreparable harm is not governed by Illinois law and its presumptions, but rather by federal law").

[19] In its Motion, Cintas refers to Paragraph 5 in support of its argument, although the Paragraph which addresses inadequate remedy is Subparagraph 3(e).

[20] Although this report and recommendation addresses Cintas' inevitable disclosure argument under the section relating to irreparable harm, it is unclear from Cintas' filings where

*Pepsico, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), is a leading case on the inevitable

disclosure doctrine. In *Pepsico*, the plaintiff sought a preliminary injunction against one of its former

executives and his new employer, Quaker Oats, to prevent the former employee from divulging trade

secrets and confidential information in his new position and from assuming any duties relating to

beverage pricing, marketing and distribution of sports and new age beverages. *Id.* at 1263, 1264.

The district court granted the injunction requested by the plaintiff. *Id.* at 1263. In affirming the

district court's decision, the Seventh Circuit applied the Illinois Trade Secret Act and stated that "a

plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new

employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id.* at 1269 (citations

omitted).

Cintas also cites *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268 (Ohio Ct. App. 2000),

in support of its inevitable disclosure argument. In *Procter & Gamble*, a senior level manager who

was primarily responsible for the international marketing of the plaintiff's hair products had accepted

a similar position with the plaintiff's competitor. *Id.* at 265. The plaintiff sued its former employee

for breach of contract and misappropriation of trade secrets. The Court of Appeals of Ohio reversed

the trial court's decision to dismiss the trade secret claim. The court criticized the trial court's finding

that actual harm was required in order to grant the plaintiff injunctive relief because an Ohio statute

expressly authorizes an injunction upon a showing of misappropriation of trade secrets, eliminating

---

Cintas believes that its inevitable disclosure argument fits into the preliminary injunction
analysis. In its post-hearing brief, Cintas presents the argument in support of its likelihood of
success on the merits as well as in its effort to establish irreparable harm. (Pl.'s Post-Hr'g Br. at
9.) Where the argument fits into the preliminary injunction analysis is potentially significant for
purposes of determining what law should apply. *See* footnote 18. However, as discussed below,
Cintas' inevitable disclosure argument is without merit under federal or Ohio law.

the need for demonstrating the ordinary equitable requirements. *Id.* at 273-74, 278. In explaining the inevitable disclosure doctrine, the court stated:

> [A] threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment.

*Id.* at 279. The court ultimately held that the plaintiff presented clear and convincing evidence that its former employee either had already used some of its trade secrets or was substantially likely to use its trade secrets to benefit his new employer. *Id.* at 280.

*Branson Ultrasonics Corp. v. Stratman*, 921 F. Supp. 909 (D. Conn. 1996), the other case upon which Cintas relies, is quite similar to *Proctor & Gamble*. In *Branson*, the defendant had been one of the leaders of the team responsible for developing the plaintiff's new line of ultrasonics joining equipment, in which the plaintiff had invested millions of dollars. *Id.* at 912. Although the defendant's new job was in metal welding, not plastic welding, the plaintiff's product was suitable for both. *Id.* The court found that the "high degree of similarity between [his] former and current employment" made it likely that the former employer's trade secrets and confidential information would be used and disclosed. *Id.* at 913.

In this case, however, Cintas has stated that it is *not* alleging that Perry misappropriated its trade secrets. *See* Pl.'s Reply Br. at 3 ("Cintas has not asserted a claim of trade secret misappropriation."). In fact, Cintas conceded at the hearing that it has not uncovered any evidence to support such a claim. (Tr. 444.) Also, Cintas has not made any effort to establish that the information it claims Perry will "inevitably disclose" constitutes a trade secret. Given those facts,

it is questionable whether the inevitable disclosure doctrine is even applicable in this case.[21]

Assuming, *arguendo,* that the doctrine can be applied outside of the trade secret context, Cintas has failed to demonstrate that it should be applied to this case. First, the evidence has not established that Perry's position with Aramark is sufficiently comparable to his former position at Cintas that the disclosure of information would be inevitable. As a NAM, Perry was responsible for selling and managing national accounts, which by definition generate more than $250,000 in annual revenue, for customers and prospective customers headquartered in Illinois, Indiana and Wisconsin. In his position at Aramark, Perry does not deal with the same size accounts, he is not focused in the same region of the country and, most significantly, he does not sell to, target or solicit customers. Rather, Perry is primarily responsible for training and developing sales managers. (Tr. 58.) Thus, unlike the defendant in *Procter & Gamble,* who "directly targeted the very products he worked on when employed at P&G" (747 N.E.2d at 280), there is no evidence that Perry, in his new position at Aramark, will target or solicit the customers he serviced while at Cintas or even prospects in the same region.

Second, even if the positions were sufficiently similar, "the mere fact that a person assumed

---

[21] Although two courts from this District have applied the inevitable disclosure doctrine outside of the trade secret context, those cases were factually similar to *Pepsico* in that they involved fierce competitors and highly sensitive marketing information. *See Kempner Mobile Elecs., Inc. v. Southwestern Bell Mobile Sys.,* No. 02 C 5403, 2003 WL 1057929 at *22 (N.D. Ill. March 10, 2003) (Schenkier, M.J.) ("While we have found no case that discusses the application of [the inevitable disclosure] doctrine in the specific context of a noncompete case that involves confidential (and not trade secret) information, we see no reason, in principle, that it should not apply in assessing both the interest to be protected and the reasonableness of the restraints imposed."); *YCA, LLC v. Berry,* No. 03 C 3116, 2004 WL 1093385 at *15 (N.D. Ill. May 7, 2004) (Leinenweber, J.) ("Although *Pepsico* involved misappropriation of trade secrets, not mere confidential information, its factual record heavily informs the present action.").

a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information' so as to 'demonstrate irreparable injury.'" *Pepsico*, 54 F.3d at 1269 (quoting *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1207 (7th Cir. 1987)). In *Pepsico*, it was essentially undisputed that the marketing manager was in possession of important trade secrets that would be directly relevant to his new employment position. *Id.* at 1264, 1266. There is no such evidence in this case. Other than the productivity tenure report and the two computer disks discussed above, there is no evidence that Perry took or now possesses any confidential Cintas information, apart from what he might retain in his memory. When Perry worked out his employment arrangement with Aramark, it appears that special efforts were made to verify that Perry would not disclose confidential Cintas information. *See* Def.'s Ex. 7, Aramark Offer Letter; Def.'s Ex. 25, New Employee Guidelines. Perry has also made a point to inform his co-workers at Aramark about the restrictions placed on him by the Covenant Not to Compete. *See, e.g.*, Tr. 545. That he did so was confirmed by his co-workers. (Harris Dep. at 13-14, 99-100; McCadd Dep. at 15; Bryant Dep. at 8; Salazar Dep. at 63, 67-68.) Other than the information he provided to Ms. Salazar for the purpose of formatting a productivity tenure report, there is no evidence that Perry has made any disclosure of confidential Cintas information to anyone at Aramark. There is also no reason to suspect that Perry needs to use Cintas' proprietary information in order to fulfill his new responsibilities. In fact, Perry testified that he has no need to rely on, or disclose, Cintas' trade secrets or confidential information to perform his job at Aramark. (Tr. 550-57).

Most significantly, Cintas has been unable to produce any evidence that, in the eight months that Perry has worked for Aramark, he has used any Cintas' confidential information for the benefit of Aramark. (Tr. 502, 510-11, 515.) It is hard to see how Cintas can claim that disclosure is

33

"inevitable" when the only disclosure that has taken place in the better part of a year has been one spreadsheet (which was used for its non-proprietary format) and two computer disks with aged data. Rather, Cintas' belief that it needs an injunction to prevent Perry from revealing its confidential information appears based on mere speculation, which is insufficient to establish inevitable disclosure.

Because Cintas has failed to establish that it will suffer irreparable injury if an injunction is denied, Cintas' Motion for Preliminary Injunction should also be denied on this ground.

### 3. Inadequate Remedy at Law

To obtain a preliminary injunction, Cintas must also show that it has no adequate remedy at law. *Foodcomm Intl.*, 328 F.3d at 304 (citation omitted). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.* (citation omitted). Cintas points again to the language of the Agreement (Paragraph 3(e)), claiming that "Perry himself even agreed that his breach of the [] Agreement would leave Cintas with an inadequate remedy at law." (Pl.'s Mot. at 14.)[22] However, as discussed above, while the provision in the Agreement may be persuasive, it is not conclusive in the determination of whether there is an inadequate remedy at law. *See Baskin-Robbins Inc.*, 264 F. Supp. 2d at 611.

Cintas further argues that it "stands to lose considerable profits and customers by Aramark's hiring of Perry" and "[b]ecause it would be nearly impossible for Cintas to accurately calculate the damages sustained by Perry, Cintas is left with an inadequate remedy at law." (Pl.'s Mot. at 14.)

---

[22] As mentioned earlier, although Cintas referred to Paragraph 5 in its Motion to support this argument, the paragraph that actually applies is Subparagraph 3(e).

Cintas has not presented *any* evidence that it has lost, or is at risk of losing, a single customer or that it has been unable to maintain a relationship with any customer due to Perry's actions or employment at Aramark. *See Medline Indus.*, 670 F. Supp. at 838 (denying injunction because the employer failed to present any evidence that the employee diverted customers to the competitor company or that the employer suffered any loss of good will due to the employee's activities). In contrast, in *Foodcomm Intl.*, 328 F.3d at 304-05, the court found that the plaintiff had no adequate remedy at law because the plaintiff had suffered a complete loss of its relationship with one of its largest customers. That is not the case here.

Cintas also argues that "the loss of trade secrets and other confidential or proprietary information is not easily measurable in money damages." (Pl.'s Post-Hr'g Br. at 13) (citing *Computer Assocs. Intl., Inc. v. Bryan*, 784 F. Supp. 982, 986 (E.D.N.Y. 1992)). Unlike the plaintiff in *Computer Assocs.*, however, Cintas is not alleging that Perry misappropriated its trade secrets. Nor has Cintas demonstrated that any confidential information has been "lost forever" due to Perry's actions. *See Computer Assocs.*, 784 F. Supp. at 986 (quotation omitted).

Thus, Cintas has not demonstrated that it has an inadequate remedy at law, and its Motion for Preliminary Injunction should be denied on this basis as well.


4.    Balancing the Harms

Because this court finds that Cintas has not made the required threshold showings, there is no need to balance the harms involved. *Kellas v. Lane*, 923 F.2d 492, 496 (7th Cir. 1990); *cf. Cooper*, 196 F.3d at 817. However, because this is a report and recommendation, this court will discuss the evidence in terms of the sliding scale analysis. *Foodcomm Intl.*, 328 F.3d at 303. Cintas

claims that its "strong showing of substantial likelihood of success on the merits of its claim for breach of the [Agreement] lessens the showing of irreparable harm that Cintas otherwise would be required to make." (Pl.'s Post-Hr'g Br. at 12.) However, for the reasons stated above, Cintas has not made a "strong showing" that is likely to succeed on the merits in this case. In fact, Cintas has failed to demonstrate that Perry solicited its customers, recruited its employees or used its Confidential Materials and Information. The Covenant Not to Compete, which Perry admittedly has breached, is unreasonably broad under Ohio law.

Cintas also argues that:

> [a]bsent the issuance of a preliminary injunction, Cintas stands to lose the benefit of the Confidential Materials and Information acquired and retained by Perry, as well as potential sales and profits. Cintas also will be forced to endure injury to its customers and employee relationships as a result of Perry's violations of the restrictive covenants in the [Agreement].

(*Id.* at 13.) However, as set forth above, Cintas has failed to demonstrate that Perry has acquired or retained any of its Confidential Materials and Information for an improper purpose or that any of its customer or employee relationships have been affected due to Perry's actions. Furthermore, Cintas has not shown that, in Perry's new position, it is "inevitable" that he will use or disclose Cintas' confidential information.

In *Medline Indus.*, 670 F. Supp. at 838, the court found that the balance of hardships favored denying injunctive relief because the restrictive covenant was overbroad, the record in the case was curiously lacking any evidence of damage, and the plaintiff chose to rely on speculation, conjecture and the mere possibility that the former employee used confidential information to harm the plaintiff. In this case, the scale is tipped in favor of Perry for many of the same reasons. The Covenant Not to Compete is unreasonably broad, Cintas has been unable to demonstrate that it has suffered any

36

actual harm by Perry's actions, and Cintas' allegations of a "threat of harm" or "inevitable disclosure" are based on pure speculation. As a result, the balance of hardships weighs in favor of Perry, and Cintas' Motion for Preliminary Injunction should be denied.

### 5.   Attorneys' Fees

Perry claims that, pursuant to the Agreement, he is entitled to the attorneys' fees that have been paid in defending this lawsuit. (Def.'s Resp. Pl.'s Post-Hr'g Br. at 15.) Cintas disagrees, arguing that "Perry's claim for attorney's fees is erroneous and untimely." (Pl.'s Reply Br. at 15.) Subparagraph 3(e) of the Agreement states: "If Employer sues Employee for an alleged breach of covenant(s) in this Paragraph 3 and *the court rules that Employee has not violated such covenant(s)*, Employer will pay all litigation costs and expenses and Employee's reasonable attorney's fees necessarily incurred in the litigation." (Agreement ¶3(e)) (emphasis added). That provision anticipates that attorneys' fees will be paid after a *final* judicial determination that an employee has not violated the Agreement. Because this matter is at the preliminary injunction stage, the decision on Cintas' motion is not a final determination on the merits. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (stating that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits"); *see also Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 264 (7th Cir. 1981) (stating that the purpose of a preliminary injunction is not to conclude the merits of the controversy, but merely to preserve the status quo until a more considered decision on the merits is possible). Therefore, Perry's request for attorneys' fees is premature.

## CONCLUSION

For the foregoing reasons, this court respectfully recommends that Cintas' Motion for Preliminary Injunction be denied. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

Geraldine Soat Brown
United States Magistrate Judge

August 19, 2004